Go ahead. Good morning. There are two undisputed findings that are critical to the issue of the voir dire in this case. One is that the district court made undisputed findings about the nature and extent of anti-LDS bias in the community in which this case was tried. And given that, this case fits into the category of cases where the government has the responsibility of demonstrating beyond a reasonable doubt that the error complained of did not contribute to the verdict. There's no place in this record where the government said, oh your honor you're being, you're exaggerating, your honor you're going too far, your honor the bias isn't that bad. It's undisputed. The second undisputed fact of the findings that the court made is that it is easy to hide, and I use that term generally, membership in the LDS faith. In other words, it is difficult to understand who may or may not be LDS, but that there are tells. And I will quote the district court. I mean I can tell you one of the jurors said they teach early morning seminary. I can tell you beyond a shadow of a doubt that person is LDS. Now, so that if during testimony something is said completely innocent and without any direct reference to religion, it is entirely possible that it will be immediately apparent to some jurors that the witness or the defendants are members of the LDS faith. Were there such tells during the course of the trial? Your honor, I am not a member of the LDS faith. I don't live in the Boise area, and so I can't tell you if there were or if there weren't. What I can tell you... I didn't see anything in the briefs either indicating that something happened during the trial. Well, the jury was told during the trial not to read any press, so I'm not going to argue that any press that occurred during the trial would have had any impact. But your honor, if you will remember, there were exhibits that were redacted. Exhibits from the company put out both in the Boise area and all over the country. Those exhibits were redacted to take out information that would indicate that these defendants were part of the LDS faith. And given that, given that fact, the marketing materials were out in the public. And so what we're trying to do is to restrict in the actual voir dire of the case what is already known in the public. Second, you'll see from one of the motions that one of the witnesses, Mr. Bushman, I believe, knew and said that he invested with the company because they were LDS. Now that was excluded from evidence in the case, but it's just more evidence to show you that the knowledge that these defendants were members of the LDS faith was known generally outside the courtroom. Third, we have Judge... the District Court talking about the tells. And fourth, we have juror comments that were made during the case. And I would refer the court to JER 3957. This is a point where the court was essentially coming out and saying the jurors have asked a question. And the question that the jurors have asked is, well, we think somebody's taking pictures of us. And I'll quote from the record. Again, in terms of transparency, Mr. Sevenson, who was the clerk, just advised me that the jurors said they thought maybe it was someone with one of the defendants' families. So again, I don't want to hide that from the jury. I misunderstood. So... So what does that have to do with LDS? What that has to do with is that the courtroom was packed each day, Your Honor. And the defendants' families were in the courtroom each day. And the jurors were identifying who the defendants' families were. And as Judge that will let people know this is a member of the LDS faith. And I think what's more important is if you consider the Facebook post that we have asked this court to consider. It is clear that the foreperson of the jury knew that these men were LDS. And there is nothing in the record to show that there is any publicity or anything else post-verdict that would have indicated their membership in this faith. And so when you take the comments that the jurors are identifying who the defendants' family members are without any evidence in the record of that identification being made, when you take the Facebook post, it is clear that there is reason to believe that these jurors understood that one or more of these defendants were members of the LDS faith. And especially when the burden, Your Honor, is on the government to demonstrate that this error did not contribute to the verdict. Okay. You've gone over your time. Unless either of my colleagues have questions, I'm going to then put the clock back to 17 minutes. Thank you.  Good morning, Your Honors. My name is Angelo Calfo. I represent Douglas Swenson, appellant. I'm going to be arguing my time on behalf of all of the appellants unless I specifically reference an argument that relates only to one of them. And I would like to reserve about four minutes for rebuttal. I'll do my best to do that. Okay. Your Honors, the appellants in this case ought to have been acquitted at the close of evidence. And in addition, this trial was riddled with criminal procedural errors of significant constitutional magnitude. And the case ought to be reversed on those grounds as well. Your Honor, this whole prosecution was based on a theory that is unsustainable. And the best way to illustrate that is to talk about the testimony from a witness named Everett Duthoy, a kindly gentleman who came into the witness stand and he testified, I invested $100,000 with this company. The prosecution asked that individual, did you know when you invested that $100,000 that this company was invested in technology companies? The answer was never in my wildest dreams would I have thought that. The prosecution listed that testimony. What the facts showed is that the private placement memorandum that offered this security to this individual who is represented by a licensed security broker, who had a duty to advise them on the suitability of the  to finance technology companies that are our affiliates. And then it identified who those affiliates were in detail by name and what they did. And yet the whole prosecution theory is that because this individual says I didn't know about it, that this is nondisclosure that could give rise. I'm sorry. I must have, I was like looking for my notes. Are you talking about the 2008 notes, public? Yes. Mr. Duthoy invested in the 2008 notes. Yes. So, so the, um, was the disclosure of the, um, use of those funds anytime before the June, 2008, uh, PPM? I think from the briefs, it seemed like the, the disclosure that those funds were going to technology companies was very late in, in June. And then if I may, your honor, I'm sorry. The disclosure occurred in the, in the months prior to the investment, because the PPMs go out before the investment is made. It was officially offered in February of 2008. So it was in the February. So disclosures about, um, some large percentage of the note funds going to the technology companies was in the February offering? Black and white, your honor, black and white. And so, so here you are. I mean, I was sitting in this courtroom looking and thinking my client can go to jail for allegedly not telling an in the offering that he provided to that investor. So that, that information was given to the jury. So you elicited that the February, 2008 offering actually included that information? Yes, your honor. And you know what else the, the broker dealers in these cases, they do their own investigation into the offerings. They hire an investigator called a due diligence investigator. Was it only the broker dealers who got that information or was it also the investors? Well, we could only market to the broker dealers. So I know the government makes a distinction between what the broker dealers knew and what the investors knew. Right, your honor. I mean, that's the whole, that's the fundamental problem with using the, you know, the instructions in this case and the theory of the case is that our clients sell to an intermediary. We are, we are directing our materials to somebody who's a licensed security professional who, and we're selling it to accredited investors who can hire lawyers and accountants to interpret the material. I mean, I was thinking like, if I bought it, if I went into a Goldman Sachs and I said, I want to buy a credit swap, okay. I mean, I'm a criminal defense lawyer, you know, but I'm going to have somebody who's going to help me walk through what a credit swap was. And if I bought this thing before the 2008 recession and I lost all my money, could I, could I say that I didn't understand what was in the PPM or I didn't know what was in the PPM, even though my licensed broker dealer who's supposed to advise me received the information and, and, and remember in each one of these investments, the broker dealer under law must make a, what's called a suitability determination, telling that particular investor that this is a suitable investment for you. And yet when the, when, when we got to closing in this case, the prosecutor said, this case is all about nondisclosure. Well, okay. But you argue that the PPMs were not misleading because they revealed DBSI's net worth was non-liquid and non-current, right? But why couldn't the jury have reasonably concluded that DBSI's practice of netting technology company receivables against note and bond payables was intended to conceal $227 million in loans to technology companies? I'll give you three reasons. That's kind of the elephant in the room for me. Pardon? That's kind of the elephant in the room for me. Okay. Well, I, you know, Your Honor, I'm going to push that elephant out the door. Because the first reason is that in the financial statements that were provided, okay, and we all know a financial statement isn't a complete statement of the company's position. It's a summary. But in the financial statement itself, it says net receivables to affiliates. Anybody who knows anything about accounting knows that number is a net number. Secondly, in the notes to the financial statement, it specifically identifies that there are $211 million, and I'm talking about the 2008 financial statements, of note and bond debt in this company. So as this company's accountant testified at trial, a sophisticated person reading that financial statement, which is who we're marketing to, would understand what's going on with that financial statement. Because you can't have $211 million in bond debt, and then look at the cover of the financial statement and not see it. The reason you don't see it, and it's right in the financial statement, is that it says net receivables. The government argues that the loans receivable from the technology companies was just phantom. In fact, the technology companies had never paid any interest or any principal back on the loans. So the purported netting was deceptive, and apparently the jury believed that. What's wrong with that? Well, I don't know what the jury believed, Your Honor, because it could also have been a million other things that they said weren't disclosed. But on this issue, the other thing that is really critical to look at when you consider these issues is the reports from the broker's due diligence investigators, because those reports identify the loans to the technology companies. They say there's significant debt. And that was the third reason the elephant goes out of the room. Is that true, what the government is saying, that in fact the technology companies had never paid any interest or principal on the loans? Yes, Your Honor, but these were investments. And so when you were netting, you're netting a phantom. I mean, this is the government's argument. You're netting a phantom receivable against an actual debt of the money from the investors. What was the evidence that it was a phantom receivable? There was no evidence, for example, Your Honor, for nine years, I think. Wasn't it for nine years? Did you see a promissory note that said there had to be a repayment at a particular time? There wasn't one. These were investments. Investments in technology. Imagine how Amazon started. The government says a couple of the companies already had failed. Is that incorrect? I think EmergeCo or something like that. Well, Your Honor, the investments went to an umbrella company called Stellar Technology that invested in a number of technology companies. So the debt was to the umbrella company, and then there was a number of companies, one of which went public after the closure. So, I mean, yes, some of them failed. Some of them were successful. But the only evidence about whether or not they believed it would be paid back, the direct evidence, was from Matt Duckett, the accountant, who said that Mr. Swenson's view was that these companies would pay, that this was an investment that would pay. It was the only evidence about what people thought about those investments. The fact there was no payment is meaningless because there was no debt to repay. There was no loan terms that were ever put into evidence. And so just like any other technology investment, you would wait for the investment to pay off. Now, Your Honors, I want to move to another issue, if I can, unless the Court has any other questions. My point is, though, Your Honor, I think when you look at the assertions by the I would urge the Court to look at the due diligence investigators' reports that were given to the broker-dealers. All of this information about debt to the loan companies, the fact that there were no payments, the fact that these companies hadn't made money, are all in the broker-dealer reports. And yet my client is convicted of not making disclosures that are in those reports. And it's a complicated case. I mean, the government can say, well, this was a phantom debt. The question is, was it disclosed and was it really phantom debt? And if you look into the record, you're going to find the answer to those questions are no. And that's what's so tragic about this case. Are you going to talk about, I hope, next, or I'm going to take you there, to the Crawford-Aranda-Bruton issue? I'm sorry, Your Honor. Crawford-Aranda-Bruton issue? Yes, Your Honor. You argue that all testimonial statements by appellants were inadmissible under Crawford. Did Crawford overrule Bruton? I mean, I see this as an Aranda-Bruton issue, not really a Crawford issue. Yes, Your Honor. No, it didn't overrule Bruton because non-testimonial statements that are not offered for their truth are still governed by Bruton. The question here is— And this, to me, strikes me as this is co-defendant. It's strictly, this is a Bruton type of situation. Well, Your Honor, the panel that you were on in Nguyen, I think— Yeah, I dissented, right? Yeah. Well, you dissented on the issue of harmless error, Your Honor. But you found, and this is what's interesting about Nguyen, it says it doesn't matter if it's a joint trial. It doesn't matter whether the statement's inculpatory. It doesn't matter who offers the statement. I was confused by Nguyen, though, because it didn't analyze the Bruton issue. And, in fact, there was nothing on the face of the opinion that I saw suggesting that it was a multi-defendant trial. Can I tell you, Your Honor, I was actually at the trial. I represented Merck. Right. With respect to the precedential value of the opinion, it doesn't say that there was a co-defendant. That was what was puzzling to me. It was only analyzing Nguyen, a single defendant. Well, Your Honor, I guess I beg to differ because I thought what Nguyen said was that the co-defendant's lawyer was the one, me, who elicited the testimony that the court later found was a Crawford violation. And so they did find that there were two defendants at the case that I elicited the testimony that implicated the other co-defendant, and that was a Crawford violation. So that's why I think it did relate to joint defense. Now . . . Your Honor, is there anything inculpatory in what was elicited? The government's position was no. The government argues no, that there was only one mention of . . . Are we talking in this case or in Nguyen? In this case, I'm back. Your Honor, look, I think the way to look at this really, because Crawford and Bruton are two sides of the coin, because even if you find a Crawford violation, you're going to need to find whether there was harmless error. And if you're on Bruton, you're basically, is the statement powerfully incriminating? So those things dovetail. And the fact of the matter, here's how I would deal with harmless error on Crawford or powerfully incriminating under Bruton. My client was argued by the government to be the alter ego of this company. Now, when Judge Windmill found that he wasn't the alter ego for purposes of Bruton, he said, well, there are a lot of people making decisions at this company. So any statement about the company can't be attributable to Mr. Swenson. Well, later in the . . . Well, what happened in trial is that everything that happened in the company was attributable to Mr. Swenson, according to the government. And then after the trial at a forfeiture hearing, the government argued that my client was the alter ego of the company. And that everything that related to that company related to him. And we cite the Eleventh Circuit case called Schwartz that discusses this very situation. And it's directly applicable here. And that is that every statement by the co-defendants in this case about the financial status of DBSI in 2008 is directly attributable to Mr. Swenson. And powerfully incriminating to him because of his position at the company and the government's position that he was the alter ego of the company. And in Schwartz, what the court said is you can't take these statements apart and claim that they're not powerfully incriminating in that type of circumstance. All right. You're getting into your rebuttal time. Did you have additional questions? Your Honor, I'm going to just keep going and then take two minutes because there's a couple of things I need to go over. Okay. Your Honor, the first thing I want to make clear is there's a . . . David Swenson, Jeremy Swenson, and Mark Ellison of one prong of the securities fraud statute and they didn't convict them of anything else. And it was the prong that's called 10B5AC. And we cited a case called Spotrunner in our brief. And what Spotrunner says is that if you are . . . in order to be convicted of Rule 10B5C or A allegation, there has to be something about this scheme that is in addition to making false statements or omissions, which is the second prong of 10B5. I don't know if I'm . . . So the government argues, so for example, in Jeremy, I guess their key issue is that he was moving money in and out of Master Lease Co. in order to make it appear that there was $15 million. So is that an action conduct as opposed to misrepresentations? Well, no, Your Honor, because the whole . . . Master Lease Co. was a fraud on the investors because we stated to them there'd be $15.4 million in the account when there wasn't. That was the claim. Now, can I just say that in every PPM, the exact amount in that account was disclosed to the investors in every single claim? But taking the government's theory that one of Jeremy Swenson's fraudulent acts was putting or directing Mr. Duckett to put the $15 million in at the end of the year when it was audited and then removing it, that struck me as more like a conduct, an act or a scheme as opposed to a misrepresentation. Your Honor, I think that the whole . . . that's not the way the government argued it. The government argued it as a misrepresentation case. What he was doing was making the false statement effective. That's all it was. And the government doesn't argue this in their answering brief, Your Honor. They don't even mention Spotrunner. So, I mean, the fact of the matter is that the government says in its brief the thrust of our case, the entirety of our case, is false representations and omissions. Your Honor, I'm going to close because I've only got a minute, 20 seconds left. But I think that I could . . . If you want to sit down, I'll give you two minutes for rebuttal. I'll do that. Okay. It's a great deal, Your Honor. All right. Good morning. Good morning. May it please the Court. Serena Case Hargrove on behalf of the United States. Your Honors, the 2008 notes PPM was a little unusual in that it did disclose the existence of the technology companies. It had a little blurb about each of them and what they did. What the 2008 notes PPM did not do and what none of the PPMs that were charged did was disclose the importance of DBSI's investment in those technology companies to DBSI. Those technology companies represented 48 percent of DBSI's net worth. And the debt that they owed to DBSI was netted against very real debt that DBSI owed to investors. For that reason, Matt Duckett, who was the COO of DBSI, repeatedly implored all the defendants to stop the netting practice. And he spoke individually on more than one occasion with Mr. Allison about that netting practice, explaining why it was so confusing. So was that not understood by the brokers and due diligence experts? I guess the argument is that if it was disclosed to them, how can we differentiate between the brokers and due diligence experts who knew and the actual investors relying on them? Absolutely, Your Honor. The answer to that is no. In 2008, the degree of that investment and the importance of that investment, the fact that DBSI's net worth hinged on that investment was not disclosed to the due diligence brokers. In 2003, it was disclosed and it had been disclosed before that when the investments were very small. And one of the due diligence officers raised a concern about the valuation of those tech companies as the full amount. They were valuing it as a current asset as though the loans would be repaid in full. Raised a question about that. And there was evidence that DBSI then stated it would value those tech companies at zero. But, Your Honor, it didn't do that. What it did was it started netting the tech company debt as it grew and grew and grew. And there was evidence showing the tremendous increase in investment in those tech companies from 2003 until 2008 when the charges in this indictment where they stemmed. And so initially, those due diligence officers had known and they had raised a problem. But in 2008, they no longer knew that because of the netting. Now, Mariah Harkins, in addition, the national sales director for DBSI, she had no idea about that. She also didn't know that the accountable reserves, the cash that DBSI admitted was not their own, belonged to the defendants. She believed even after DBSI had stopped sales, that those accountable reserves were still in place to help the investors. The defense here argues that the accountable reserves was merely an accounting issue. And that, in fact, they had no requirement to segregate funds and they could use it as long as they made it available at the appropriate time. Yes, Your Honor. And Jeremy and David Swenson convinced Matt Duckett, the COO, and Gary Bringhurst, the insider who pleaded guilty, that it was acceptable to use those funds that way because DBSI so desperately needed cash because it had mined everything else. Now, what Matt Duckett didn't know and what the defendants did know was that they had promised, and there was evidence that Jeremy and David Swenson were in charge of the language regarding accountable reserves and all the PPMs. They had promised that accountable reserves would be used exclusively for their specific properties. So investors thought they were accountable to the property. And Mariah Harkins advised investors and other financial folks who worked for DBSI advised financial advisors that accountable reserves were in a separate account. We made one mistake in the brief, and that was saying that all of the advisors who testified had believed that they were in a separate account. One of them, Mr. Hirsch, testified he wasn't certain where they were, but he thought they could only be used for the specific properties. So yes, Your Honor, that is the defense they raised at trial. That was not what was promised in the PPMs, and it's not what their own people believed even after they had shut down sales. Mariah Harkins received a desperate call from a financial advisor trying to help his particular investor figure out how to cover additional expenses on the property, and she assured him in October of 2008 because she believed it, that the accountable reserves were still in place. They were gone. They had been swept into DBSI's general funds and used. A tiny portion of them had been used for the capital improvements they were supposed to create, but most of them had simply been spent by DBSI. I have a Crawford Britton question because I want to understand the government's position. Um, I think that everyone agrees there was not a limiting instruction given, correct? That's correct, Your Honor. So that's not a disputed fact. Richardson seems to require a limiting instruction when you introduce co-defendant statements, but you seem to, if I understand your argument, you seem to say because it wasn't inculpatory that you don't have to give a limiting instruction. Are you reading Richardson to only say that you have to give a limiting instruction when there's inculpatory evidence? No, Your Honor, we're not. Okay, so tell me how you're structuring that. Certainly, Your Honor, the government's position is that although limiting instructions were readily available and the government anticipated having limiting instructions as to each of these statements, the defendants waived a limiting instruction. In their briefing before the district court in Lemonet, they argued that an instruction was irrelevant, and this turned on their argument that Nguyen governed and Crawford governed and Bruton had no real applicability any longer. The district court disagreed with their overall argument and issued a very clear ruling explaining that Bruton did govern. The district court also told the defendants on two separate occasions that it was going to be very careful about limiting instructions because there is case law that shows that judges can do real mischief if they offer them without having them requested. They didn't waive the limiting instruction. I mean, they didn't say, we agree, no limiting instruction is necessary. They just didn't raise a request for a limiting instruction, even though the district court solicited such a request. That's how I read the record. Isn't that correct? Your Honor, I think it goes a little bit further than that, especially for Douglas Swenson, because in Jeremy Swenson's statement, there was a mistake and there was an unredacted section that mentioned Douglas Swenson's name and the district court found that it was not inculpatory and so on, but it did mention the name. And at that point, the government called attention to our mistake and offered a limiting instruction and the district court agreed that a limiting instruction would be appropriate. Douglas Swenson's counsel declined and he said he didn't want to ring the bell twice, but the kind of limiting instruction anticipated by Richardson or Bruton wouldn't ring any bell twice. It would simply limit the statement to the declarant. So our position, Your Honor, is that Douglas Swenson did waive a limiting instruction and the other three defendants never raised that issue. So it's your position that Richardson does require a limiting instruction when you introduce co-defendant statements in a Bruton fashion? Yes, Your Honor. And it's also our position that they waived that, Douglas Swenson waived that below and all the parties waived it on appeal because they never raised any error coming from the absence of a limiting instruction. Well, let's assume if we, and I'm just saying, let's go with a hypothetical that we don't agree with you and I don't know whether we do or we don't because we haven't talked about it, but let's assume we don't agree with you on that. Then are you making a harmless error argument? Yes, Your Honor. We absolutely are. And it would have to be harmless beyond a reasonable doubt, but it was harmless beyond a reasonable doubt in this case. The district court found correctly that the one mention of Douglas Swenson did not actually inculpate him. It was simply about his calculation of accountable reserves early on. And there was nothing wrong with accountable reserves and calculating them. It was actually a good idea. What about their argument that EBSSI is the same as Douglas Swenson? Yes, Your Honor, the Schwartz argument. This case differs dramatically from Schwartz. DBSI, the aspects of DBSI that the individual defendant's statements went to were really about very detailed nuts and bolts, parts of an incredibly complex company. They were talking about the roles, David Swenson and Jeremy Swenson were talking about the very specific roles they played for companies within DBSI. And they were not talking about DBSI writ large. They were talking about details within it. So even if Douglas Swenson was considered the alter ego, these statements did not have that same power. Schwartz was really replacing the defendant's name with his company's name. Very, very different that way. Furthermore, the statements made were very self-limiting to the declaring defendants themselves. Other than the one mention of Douglas Swenson in a non-inculpatory way, the statements were solely about the individual defendants. So what is your argument in U.S. v. Wynne, this Court held that it matters not whether a testimonial statement inculpates a defendant to find the error under the confrontation clause. Is that an accurate statement of that case? That's an accurate statement of the case, Your Honor. Hernandez and Johnson, however, which came after Nguyen, have explained that Bruton still does have force. And we explained in some detail in our brief. I went back and reread the briefing in Nguyen, and Bruton really wasn't mentioned. The Court did mention Bruton in a footnote later in Nguyen after the portion that you just summarized. And so even the Nguyen Court appears to have acknowledged Bruton. It just didn't base its decision correctly on Bruton. And so, and it's never been cited for the proposition on which the defendants relied upon it. In addition, every other circuit, the First, Second, Fifth, Sixth, and Eighth that have ruled on the Bruton and Crawford issue have all held that Bruton still applies. And as a matter of logic, it has to. It applies in this particular situation where we've got a joint trial. Crawford did not address that. Although it did mention Bruton, and it mentioned that it wasn't touching the fact that it is still acceptable to use a declaring defendant statement against himself. Okay. Could I just ask a question about Jeremy Swenson? Other than Mr. Duckett's testimony that Jeremy Swenson directed money being moved in and out of Master Lease Go account, was there any other evidence in the record that Jeremy Swenson had participated in fraudulent activities? And he was present. He was there. He heard things. But what else did he do? Your Honor, there was other evidence of his knowledge for sure. He was well aware of the undisclosed loans, of the undisclosed sales of property. Let's assume he knows everything because he had participated in all the meetings. His knowledge that the company was doing shady things, which is what the government alleged, that's not enough to convict him, correct? He has to, at a minimum, aid and abet that. So what was he doing besides the Master Lease Go, the Duckett testimony regarding the Master Lease Go account? Your Honor, that was the principal evidence that was solely against Jeremy, and you've hit the nail on the head there. Jeremy was, however, also responsible for the accountable reserves language in those private placement memoranda. Folks had to check with him before they issued PPMs, dealing with accountable reserves. And he well knew that what was being represented, what they were approving for those accountable reserves language, was false. He was at the cash meetings. He was at the financial statement meetings. He knew that DBSI was desperate for cash. And whose testimony established that he was responsible for the accountable reserves language? Your Honor, it was at JER 7693 through 97 and at 3107. There was also evidence that the Master Lease policy statement had to be reviewed by Jeremy and David. The Master Lease policy statement came about in an interesting way. Mariah Harkins had wanted to give due diligence officers, a due diligence officer who was coming to visit DBSI, she'd wanted to be able to give that due diligence officer a breakdown of the Master Lease portfolio and how it was doing in aggregate. But the defendants had taken that report out of reports sent to investors in 2005 when the Master Lease began cash flowing negative. So she advocated for the information to be given to due diligence officers so they could do the reports and pass them on to the financial advisors. That was denied. So then she asked Mark Ellison and Douglas Swenson if she could just see the aggregate statement herself. And she agreed she would keep it in a close-knit circle and not reveal it outside. And Douglas Swenson said no. And so what the defendants ended up doing was creating a Master Lease policy statement. That was their answer. And this statement assured broker-dealers and assured due diligence officers that the Master Lease was doing fine. And Jeremy and David had to approve that language as well. So the fact of their knowledge is actually very important because they were also approving things. So their approval is an action is what you're saying? Yes, Your Honor. It's part of the scheme. It's part of running the entire business to further that scheme and to further the business. In terms of Spotrunner, I wanted to address that briefly. We charged a scheme and we provided ample evidence and cited ample evidence in our responsive brief about that scheme and about concealment fraud. The scheme we were alleging was that the defendants actively participated together to conceal their fraud. And the defendants, the three defendants, were convicted of operating the business in such a manner as to defraud investors. So we did not mention Spotrunner in our responding brief, but we certainly amply addressed their argument. And you concede restitution error as to three of the defendants? Yes, we do, Your Honor. And because there was double counting? Yes, Your Honor, there was. And we would ask that the court remand with instructions to reduce the amount of restitution for those three defendants by the amount set forth in our brief. If there are no further questions, Your Honor, the government will rest. Thank you. Thank you. I'll take her time as well, Your Honor. Well, that I'm not going to give you. Can we make a deal? You can try, but you failed. But the rest, but you did get a deal. Go ahead. I know the way the court works and, you know, there are so many important issues that are raised in our briefs. I mean, we didn't even get to the issue of us having to turn over our cross-examination exhibits before people testify, the courtroom closure, the judicial testimony relating to Agent Morris. We've reviewed all of those. These are huge issues and I would love to have had an opportunity to argue them. But I want to first talk about the Spotrunner case. I'd like if the court could look at our reply brief at footnote two. It describes the way the government described the scheme here. It said, false representations and material omissions in the PPMs are the crux of the fraud, charged in the indictment and proven at trial. That's in their answering brief, Your Honor. Now how, you remember, they were acquitted of any scheme to defraud, acquitted of making any false statements or omissions. There's this nebulous subsection C about engaging in a practice that may be a fraud against investors. What is it that someone could do that constitutes that, you know, subsection? And that's the problem with the government's case. They're admitting it's only a false representation and omission case. That's what they say in their brief because it's true. And whatever Jeremy Swenson did with MasterLeaseCo is just an effort under the government's theory to defraud the investors by telling them that there's something in the account that wasn't. Now, I would just reiterate, Your Honors, in every single PPMs, the amount of dollars in the bank account of MasterLeaseCo is disclosed. That's what's so shocking about the way the government presented this case. It is disclosed. And I would just say, you know, Ms. Hargrove wasn't the trial counsel. She doesn't know all this. But when she said to you that the brokers were not aware of the debt to the technology companies because of denetting, that's just verifiably inaccurate. I ask you again, look at the 2008 PPM notes and look at what Brian Mick, the due diligence investigator, says about the debt to the technology companies. He had access to Paul Judge who ran Stuller Technologies. He notes the debt in the due diligence report. This whole case, this is why that materiality instruction which we provided said, you know, your basic securities law is that you have to look to determine materiality and disclosure, everything that was available to the investor. Now, the judge didn't give us that instruction. It was a devastating blow to our ability to say to the jury, look at the due diligence reports because that counts. The government is up here arguing to you as though it doesn't count, but black letter law is that it counts. And I would just urge the court, whenever the government says something isn't disclosed, look at those due diligence reports. You'll be shocked. I mean, the idea that it wasn't disclosed is almost shocking when you're a criminal defense lawyer watching a client getting sent away for not telling somebody something that's in the materials. Now... All right. You've gone a minute over. So... Your Honor, if I could argue that I did want to discuss quickly the limiting instruction issue. No, I've given you... Unless either of my colleagues have a question, your time is expired. Okay. They don't appear to have a question.  Well, I appreciate your time. All right. We'll stand on the briefing then. Thank you. All right. Thank you both for your excellent argument in this matter, and it will stand submitted.
judges: Fernandez, Callahan, Ikuta